**MAX AND TOOKAH CAMPBELL CO., INC., a charitable foundation,
Appellant,**

v.

**T. G. & Y. STORES, a Delaware Corporation, and Read's of Oklahoma, Inc., an Oklahoma Corporation, Appellees.**

No. 52794.

Court of Appeals of Oklahoma, Division 2.

Jan. 13, 1981.

Joe Francis, Tulsa, for appellant.

Sam P. Daniel, Jr. and William E. Hughes, Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, for appellees.

BRIGHTMIRE, Judge.

The owner of a shopping center filed this action seeking cancellation of a lease and an injunction prohibiting the lessee from "permitting" its sublessee to enter the leased premises. The trial court held a hearing "on Plaintiff's Application for a Restraining Order, Temporary Injunction and Mandatory Injunction" and denied it. The shopping center appeals. We affirm.

I

In 1963, Southland Shopping Center, Inc.,[1] executed a 20 year lease with T. G. & Y., a large variety store chain, covering nearly 18,000 square feet of floor space. It contained a provision for four automatic extensions of five years each at an annual rent of $42,355.56 or 4.33 percent of net sales on the premises, whichever is the greater amount.

The lease gave T. G. & Y. the right to assign or sublease the premises without Southland's consent provided the assignment or sublease did not violate any "written exclusives" previously granted to other tenants in the center. Compliance with the proviso was to be accomplished in this manner: "Lessee shall notify Lessor in writing of its intention to assign or sublease and Lessor shall, within fifteen (15) days after receipt of said notice, furnish Lessee a certified list of the exclusives which are in effect on the date Lessor received said written notice."

Another factor relevant to the controversy is that T. G. & Y. did not lease any of the exterior portion of the building, but one of the lease terms did permit the lessee to "erect on the exterior of the leased building, signs advertising its business, as shown [in the lease], which signs shall be erected and maintained in accordance with" local and state law at lessee's expense.

T. G. & Y. occupied the premises until the spring of 1978. On May 30, 1978 it executed a sublease with Read's of Oklahoma, Inc., a clothing store.

On June 22, 1978 Southland filed this lawsuit against T. G. & Y. alleging "that defendant has entered into a sublease with Reed's [*sic*] Department Store and intends to permit it to enter the premises . . . and operate a business different from a variety store . . . . Such sublease is in violation of the base lease . . .; an operation of a department store by [Read's] would do irreparable damage to the plaintiff."

Pleading further, Southland alleged that the sublease contravened the terms of the base lease in two respects: (1) sublessee's type of business (department store) is different from that of the base lessee (variety

---

1. Plaintiff, Max and Tookah Campbell Co., Inc., a charitable foundation, inherited Southland Shopping Center from Max W. Campbell upon his death prior to 1977.

store); and (2) subleasing the property to Read's "contravenes commitments made by plaintiff's predecessor to other tenants in the shopping center by prior leases."

Southland, without explaining just how it would be irreparably injured by the Read's sublease, asked the court to rescind [2] the T. G. & Y. lease and enjoin defendant "from permitting Reed's [sic] Department Store from entering the premises as sublessee."

Five days later Read's was permitted to intervene in the lawsuit and it filed an answer detailing the terms of the sublease which, it said, did not violate the primary lease.

The evidence, while conflicting in certain respects, consisted of undisputed operative facts. Joan Lepley, president and general manager of Southland,[3] said two lease brokers came to her office in May of 1978 and told her they understood the T. G. & Y. space was for lease and they had someone interested in it.

"I told them that I was not aware," said Lepley, "that I had heard conversations for probably a year that the space, that they wanted to give the space up, but I had not been notified."

As a result of this information she contacted John Neale, manager of Read's. "I called John Neale, because I had a letter from him dated back in April that they were interested in space in Southland," she added.

The day before Lepley left to attend a shopping center convention in Atlanta, Georgia, she made it a point to again talk to Neale. "Mr. Neale and I made a *verbal agreement* in my office," said Lepley, "[that] if I *did find that* T. G. & Y. definite-

ly wanted to give the space up ... that he was interested in it. *We reached a set rent on it, which he verbally agreed to* .... It was four dollars and fifty cents a square foot *plus* a five percent overage." [4]

The rest of Southland's case in chief centered around the "exclusive" rights provision of other tenants' leases—J. C. Penney, Froug's, Brown-Dunkin and Clarke's. The gist of each lease was that lessor promised (1) to have a national variety store in the center and (2) not to "lease any space in the center or any expansion or enlargement thereof to any department store *other than* Froug's, Brown-Dunkin[,] J. C. Penney" and Clarke's (with regard to men's wear).

Lepley stated that in her opinion occupancy of the T. G. & Y. space by Read's instead of a variety store "would definitely create damage to the shopping center," but admitted the amount or extent of such damage could not be estimated.

Neale denied making any kind of an oral agreement with Lepley, although he said he did talk to her about the T. G. & Y. space and determined she had no objection to Read's occupying it. Later his father—head of Read's—approached T. G. & Y. about a sublease.

Read's further evidence was that before the sublease was executed T. G. & Y. wrote Lepley saying: "This is notice, in accordance with provisions set forth in Section entitled, 'Sublease or Assign' of lease dated March 20, 1963, as amended, that T. G. & Y. Stores Co., intends to sublease the captioned store. Please furnish Lessee a list of written exclusives in effect this date."

Lepley responded to this with a letter dated May 30, 1978 saying: "As per your

2. Southland uses the term rescind but in fact wants the court to cancel the lease. Besides not alleging any basis for rescission, it would be rather difficult for the court to restore the parties to their pre-lease position after 14 years of occupancy by T. G. & Y.

3. Lepley went to work for the late Max Campbell 14 years earlier when she was 19-years-old and soon became the center's manager. Camp-

bell later, in 1968, sent her to the University of Arizona for a shopping center management course and after that for training "in London, in New York, all over the states."

4. (emphasis added) This "agreement" calls for rent of at least a million dollars higher than that payable in the T. G. & Y. lease, according to Lepley.

request of May 24 for a list of written exclusives presently in effect on the captioned store, the lease between J. C. Penney Company and Southland Shopping Center, Inc., includes the following ... 'Landlord agrees that no portion of West Mall lying north of Central Mall nor any portion of the west 400 feet of Central Mall will be utilized for sales purposes of any kind without Tenant's prior written approval.' "[5] On the same day T. G. & Y. executed the sublease in question effective as of September 1, 1978 and terminating March 31, 1990. The sublease was subject to all the terms of the primary lease, including the obligation to pay Southland the same rent T. G. & Y. paid.

Upon learning of the sublease, Southland, through its attorney, Joe Francis, contacted both T. G. & Y. and Read's and told them that the sublease violated the lease provisions of other center tenants. A few days later this action was filed.

## II

Southland frames its first proposition thus: "In any event defendant is a trespasser with no right to install and maintain its sign on the exterior part of plaintiff's shopping center." Its supporting argument is that: (1) Read's has no greater rights than T. G. & Y. to erect the sign; (2) injunction is the proper remedy for a continuing trespass; and (3) the court may not ignore "clear [and] unambiguous language [in the lease] with reference to the sign."

The argument is interesting. It offers legal premises with which we agree but a conclusion which is factually a non sequitur—that is, the sign erected by Read's has not been shown to thwart the terms of the primary lease and, therefore, there exists

no record foundation to which to anchor a finding that the sign reduces Read's to the status of a trespasser.

The lease authorized the lessee (T. G. & Y.) to "erect on the exterior of the leased building, signs advertising its business, as shown on Exhibit E," a drawing attached to the lease. Pictures in the record disclose that Read's sign "Read's" conforms to the size and location specified in the drawing. It is evidently Southland's position that the only name that can go up on the facade is "T. G. & Y." This, we think, is a strained and unrealistic interpretation of the lease. The right to sublease carries with it the right to assure the sublessee that it will enjoy all rights and privileges possessed by lessee except those specifically modified or prohibited. Nothing in the lease specifies that a sublessee shall not have the same right as the lessee to erect a sign on the building exterior. Sure, the drawing contains the name T. G. & Y., but this is because it is the original lessee. Nothing in the lease destroys the inference that any later legal occupant of the building under the lease may erect a sign consistant with the size and location of the one shown in the drawing.

And, as the trial court pointed out, the sign is up and cannot, under the circumstances, be the subject of a temporary injunction.[6]

## III

Southland's second proposition is that the "court erred in refusing to enjoin T. G. & Y. from subleasing to Read's." The theory is that the lease permitted T. G. & Y. "to sublease only if 'such sublease shall not be in violation of any written exclusive'

5. Southland's lawyer readily admitted at the time of the hearing and during oral argument, in this court that Lepley "blew it" because the exclusive she sent to T. G. & Y. in no way restricted its right to sublease.

6. Moreover, the trial judge did not abuse his discretion in denying the mandatory injunction.

Based on prima facie evidence of a valid sublease between T. G. & Y. and Read's, the court found no trespass to Southland's property. And, in the absence of a continuing trespass, the court would have no basis for mandatorily requiring Read's to remove the sign.

with previous tenants .... It was undisputed that plaintiff did have exclusive leases with other tenants, prohibiting the subleasing to this tenant."

■ The short answer to this is the sublease had long since been executed by the time this action was filed making it impossible for the court to "enjoin T. G. & Y. from subleasing the property. It is not the function of a preliminary injunction to undo completed transactions or change the position of the parties, but to maintain the status quo until the merits of the principal action can be determined.[7]

## IV

■ The third proposition posed by Southland is that the "court erred in basing its decision on the assumption that only the other tenants could object to the sublease to Read's"—a conclusion apparently based on the court's comments made at the end of the hearing. The argument is that Southland also could and did object to it.

First of all the trial judge's prejudgment comments do not warrant the conclusion that he entertained such an assumption or that his decision was based on it. He did discuss the fact that the evidence failed to disclose any objection on the part of other tenants and in fact featured a letter from one tenant—a clothing store—welcoming Read's—also a clothing store—to the family of Southland tenants and stating it had no objection to its occupancy of the subject premises. But Southland's right to object was not specifically discussed. The court concluded Southland's evidence not only failed to show it had suffered irreparable harm by the sublease but, on the contrary, Read's could well suffer such harm by the issuance of a temporary injunction because it had purchased a large inventory of dry goods to satisfy the requirements of a brisk November and December 1978 market.

In this the trial court was correct. He could have found also that Southland waived whatever right it had to object when it offered the space to Read's at a higher rent. As the arguments of Southland took shape in the lower tribunal and in this court it became obvious that the ostensible need for a "national variety store" to occupy the premises as a business drawer shriveled to insignificance by Southland's admission that if Read's will agree to pay the rent the lessor wants, this lawsuit it will drop.

The third proposition is without substance.

## V

The last contention advanced is that the court erred in refusing to cancel the lease and issue an injunction because Read's is not in privity of contract and has no greater rights in the lease than its assignor, T. G. & Y., had.

We have difficulty following Southland's rationale. The essence of the argument is contained in the last paragraph which reads:

"Read's is not in privity of contract with plaintiff and stands only in the shoes of its sublessor. It had no greater rights than its sublessor (assignor). TG&Y assigned its rights in the lease to Read's but this assignor has taken action which estops it from asserting any defense to plaintiff's suit for cancellation. *TG&Y has no legal damage.* By statute in Oklahoma, Read's cannot get relief against plaintiff under the lease, if it has damage."[8]

If by this Southland is saying that the assignee, Read's, has no legally protectable interest in the sublease because T. G. & Y. ceased to have any after executing the sublease we think maybe we are being offered a small quantity of sophistry. Besides being exactly contrary to black letter assign-

---

7. *Drummond v. Jeffrey*, 179 Okl. 409, 65 P.2d 1212 (1937).

8. (emphasis in original)

ment law the contention begs the question—does Read's have a valid sublease. The only issue disposed of by the trial court was whether or not a temporary injunction should issue. During his decisional comments the judge left the validity of the lease open saying, Read's stands in the shoes of T. G. & Y., assuming they have properly subleased the property" and, at the conclusion of his remarks, "I think for those reasons I would have to decline your request for temporary injunction."

We hold that the trial court did not abuse his discretion in denying the temporary injunction and other extraordinary relief. The order appealed is affirmed.

BACON, P. J., and BOYDSTON, J., concur.